In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FAUSTO NUNEZ, ALSO KNOWN AS
ANTONIO ROSALES,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 CR 161—**Sarah Evans Barker**, *Judge.*

———————

ARGUED MAY 16, 2008—DECIDED JULY 11, 2008

———————

Before BAUER, POSNER and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* From April through October of
2004, the Drug Enforcement Administration (DEA) in
Indianapolis conducted an investigation of a multi-state
methamphetamine trafficking organization after a confi-
dential informant bought one pound of methamphetamine
from an individual, who was seen getting the drugs
from Expedito Carrillo (also known as Isidoro Lopez-
Salas). The investigation revealed that Carrillo supplied
drugs to several other individuals, including Defendant-

Appellant Fausto Nunez.[1]

On October 6, 2004, Nunez was indicted on one count of conspiracy to possess with the intent to distribute and/or to distribute fifty grams or more of methamphetamine, and/or five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846.[2] Nunez was arrested on October 7, 2004 at his residence, pursuant to a federal arrest warrant. The case was tried by a jury in January of 2007, and Nunez was convicted as charged.

On appeal, Nunez argues that the district court erred in permitting the jury to use transcripts of intercepted phone conversations that marked and defined alleged code words for drug terms. Nunez also asserts that multiple instances of prosecutorial misconduct amount to cumulative error resulting in an improper verdict. For the following reasons, we reject Nunez's contentions and affirm his conviction.

### A. The Transcripts

Over the course of the investigation, the DEA obtained four different court-authorized wiretaps on the cellular

---

[1] This was determined through surveillance of drug deals between Carrillo and the other co-conspirators, and was confirmed by Nunez during a proffer session in which he told the government that he had purchased two and a half pounds of methamphetamine from Carrillo.

[2] On January 25, 2005, Nunez was charged by superceding indictment with the same.

phones of Carrillo and other co-conspirators. Between June 18 and September 11, 2004, the DEA intercepted at least 120 conversations between Nunez and Carrillo, the majority of which were in Spanish.

On November 22, 2004, Nunez and his attorney appeared at the DEA's office in Indianapolis for a proffer session. DEA Special Agent Kevin Steele was also present. Nunez listened to three of the intercepted conversations between himself and Carrillo and advised Agent Steele that he used the terms "lemonade" and "windows" ("ventanas" in Spanish) as code words when he spoke to Carrillo about methamphetamine.

Twenty-one of the conversations intercepted between Nunez and Carrillo were admitted at trial. Because those conversations were in Spanish, Spanish-speaking language specialists who had monitored the calls during the investigation prepared transcripts of the calls in English. The transcripts were then provided to the jurors to assist them in understanding the recorded conversations. Some of the transcripts contained words that the language specialists had determined were code words. Those words were denoted in the transcripts with either quotation marks or a footnote containing the language specialists' understood definitions of the code words. The transcripts contained footnotes defining the following words:

> Greñudas [hairy ones] = Mexican word usually used by drug dealers as code when referring to Marijuana.

> Tickets = Word usually used by Mexican drug dealers as code word when referring to money.

> Picture [retrato] = Mexican word usually used by drug dealers as code word when referring to a *sample* of any narcotic substance or product.

Lemonades [Limonadas] = Mexican word usually used by drug dealers as code word when referring to narcotic substances or products.

Nunez objected to the use of quotation marks and footnotes in the transcripts, arguing that "the selective use of quotation marks highlighting the Spanish terms and using footnotes is improper . . . as a means of bolstering the government's case. . . ." The district court judge ruled that the use of quotation marks and footnotes was not prejudicial or misleading, and at Nunez's request, gave a cautionary instruction to the jury regarding their use:

Those footnotes and [a language specialist's] use of that way to explain what she heard as she translated is a statement that she's made as a witness to you with respect to these matters. You don't necessarily have to accept that. And in any event what weight you choose to give to that, whether it makes any difference to you in your deliberations, will be entirely up to you to decide.

The language specialists testified at trial that the transcripts reflected what they heard in the conversations, and that the footnotes and quotation marks were based on what they understood the code words' meanings to be from their own experiences. They also testified that they inserted the quotation marks and footnotes on their own accord, and not at the government's (or anyone else's) request.

Agent Steele, a Missouri State Trooper for fourteen years and a DEA special agent for seven, testified that in his training and experience, code words such as "lemonade" and "windows" referred to methamphetamine, "greñudas" referred to marijuana, and "tickets" referred

to payment for drugs. Nunez testified in his defense and admitted that he was a drug dealer and agreed that "greñudas" meant marijuana and that "tickets" referred to money, but claimed "lemonade" also referred to marijuana and that he was unfamiliar with the term "windows." Because Nunez's testimony at trial about the code words' meanings contradicted the definitions he supplied during his proffer session, Agent Steele returned to the stand in the government's rebuttal case and testified about Nunez's proffer statements, including Nunez's statement that the terms "lemonade" and "windows" referred to methamphetamine.

Nunez's first argument on appeal is that the district court erred in permitting the government to introduce transcripts of the wiretap calls that included quotation marks and footnotes concerning certain words that it claimed were code words for drugs. We review the district court's decision to allow the government to introduce the transcripts under an abuse of discretion standard. *United States v. Ceballos,* 385 F.3d 1120, 1124 (7th Cir. 2004); *United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004). The district court has wide discretion in determining whether to allow juries to use written transcripts as aids while listening to audio recordings. *Breland*, 356 F.3d at 794 (citing *United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985)). We will not disturb the court's decision if the error was harmless. *See* Fed. R. Crim. P. 52(a); *see United States v. Gochis*, 256 F.3d 739, 742-43 (7th Cir. 2001) (stating that an error is harmless if the defendant's substantial rights are not affected) (citing *Peguero v. United States*, 526 U.S. 23, 29 (1999)). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persua-

sive had the improper evidence been excluded." *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007) (internal quotation omitted).

Transcripts of recorded conversations are a virtual necessity when the conversations take place in Spanish and are admitted into evidence before an English-speaking jury. *See United States v. Comargo*, 908 F.2d 179, 183 (7th Cir. 1990). In both *Ceballos* and *Breland*, the district court allowed the jury to use transcripts of intercepted phone conversations that identified the alleged speakers when the defendants contested the identities of the speakers. *See Ceballos*, 385 F.3d at 1124; *Breland*, 356 F.3d at 795. During those trials, the government presented testimony from lay witnesses that identified the voices heard in the intercepted conversations as the voices of the defendants. *Id.* The district court in *Ceballos* instructed the jury that the defendants contested their voice identifications marked on the transcripts, while the district court in *Breland* informed the jury that if there was any variation between the tapes and the transcripts, they were to rely solely on the tapes. This Court said that both district courts properly instructed the jury and so there was no abuse of discretion. *Ceballos*, 385 F.3d at 1124; *Breland*, 456 F.3d at 795.

Unlike the district court's instructions in *Ceballos* or *Breland*, here the district court's attempt at a curative or limiting instruction was to tell the jury that it could afford as much weight as it felt proper to the transcripts of the intercepted conversations. Yet transcripts should not ordinarily be given independent weight. *See United States v. Jordan*, 223 F.3d 676, 689-90 (7th Cir. 2000) (district court properly instructed the jury that the transcripts of recorded conversations were not evidence and that

only the tape recordings were entitled to weight); *United States v. Singleton*, 125 F.3d 1097, 1105 (7th Cir. 1997) (same); *see also* 12A Fed. Proc., L. Ed. § 33:641 (outlining proper jury instructions for transcripts of audio recordings). The jury should be instructed that it is the tape recording itself which is the primary evidence, that the transcript is to assist the jury in evaluating the primary evidence, and that if the jury determines that the transcript is in any respect incorrect, it should disregard it to that extent and rely on its own interpretation of the recording. *See Comargo*, 908 F.2d at 183 (discussing appropriate limiting instruction for jury's use of transcripts); *United States v. Doerr*, 886 F.2d 944, 966 (7th Cir. 1989) (same).

The district court erred by telling the jury that the transcripts—in particular, the language specialists' code word definitions—could be given any weight at all. Yet this error does not amount to reversible error, since the language specialists testified at the trial as to their definitions of the code words marked in the transcripts, and that testimony was entitled to as much or as little weight as the jury wanted to give it. In addition to the language specialists' testimony regarding the code words, DEA Agent Steele testified as to their meaning and as to Nunez's definitions of the code words provided during the proffer session, all of which mirrored the definitions contained in the transcripts. The district court's instruction did not allow the jury to consider evidence of the code words' meaning that was not already in evidence apart from the transcripts. We find that the case was persuasive of Nunez's guilt without the transcripts.

**B.  Prosecutorial Misconduct**

Nunez also argues that multiple instances of improper statements, questions, and argument by the prosecutor had the cumulative effect of denying Nunez a fair trial. Specifically, Nunez contends that the prosecutor's line of questioning that forced Nunez to call a DEA agent a liar was improper, as was the prosecutor's comment that Nunez's testimony regarding his recollection of the proffer session was "patently false." Nunez also claims that the prosecutor improperly vouched for Agent Steele's credibility, disparaged defense counsel, and insinuated that defense counsel believed Nunez was guilty during its closing argument.

In reviewing a claim for prosecutorial misconduct, we first address the alleged misconduct to determine if it was in fact improper. *United States v. Corley*, 519 F.3d 716, 727 (7th Cir. 2008). If it was improper, we next consider whether it prejudiced the defendant. *Id.*; *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007). We address each alleged error in turn to determine if any were improper before we consider Nunez's cumulative error argument.

### 1.  Asking Nunez to Comment on DEA Agent's Credibility

During the government's case-in-chief, a DEA special agent testified that when Nunez was arrested on October 7, 2004, Nunez told the agent that his name was Antonio Rosales. Later in the trial, Nunez testified that he had not, in fact, identified himself as Rosales to the agent. On cross-examination, the prosecutor asked Nunez if the agent was lying. Defense counsel objected to the question, but the district court overruled the objection and Nunez

responded, "Yes, because I never tell him my name was Antonio Rosales in the beginning."

Nunez contends that the prosecutor's question to Nunez of whether a DEA agent was lying in his trial testimony was improper. Nunez contemporaneously objected to the prosecutor's question, thus we review the district courts' decision to let the question stand under an abuse of discretion standard. *See United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002).

The government takes the position that the question posed to Nunez "was a fair one, and allowed the jury to evaluate Nunez's credibility in light of other evidence in the case." But this circuit's precedent makes clear that assessing the credibility of a witness's testimony is the job of the jury, and asking a defendant to comment on the veracity of the testimony of another witness is improper. *United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *United States v. McKee*, 389 F.3d 697, 699 (7th Cir. 2004). The majority of our sister circuits agree. *See United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006); *United States v. Williams*, 343 F.3d 423, 438 (5th Cir. 2003); *United States v. Sanchez*, 176 F.3d 1214, 1220 (9th Cir. 1999); *United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996); *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987); *but see United States v. Williamson*, 53 F.3d 1500, 1523 (10th Cir. 1995) (finding the reasoning employed in *Richter* to be unpersuasive as to why such questions are improper). We find that the prosecutor's question to Nunez was improper, and the district court erred in allowing it.

### 2. Prosecutor's Remark that Nunez's Testimony Was "Patently False"

Nunez testified about his recollection of the November 22, 2004 proffer session. Nunez claimed that his former attorney told him to lie at the proffer session and that the government had promised him a deal, which involved the possibility of no jail time. Nunez stated that he lied at the proffer session in an effort to serve these interests, but that the government agents had lied to him as well. During Nunez's redirect examination, defense counsel asked Nunez to describe what he remembered taking place during the proffer session. During Nunez's response, the government objected to the answer as being "unresponsive to the question . . . as well as being patently false." The district court judge sustained the objection and said, "I'll strike the unsolicited remark and improper remark of counsel and direct the jury not to consider it."

The government concedes that this comment was improper, but maintains that the district court swiftly cured the impropriety with its instruction. Nunez contends that this error standing alone warrants reversal. We disagree. Undoubtedly, this comment was improper, but misconduct by a prosecutor that is promptly and vigorously corrected by the district court judge is not reversible error. *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir. 1986).

### 3. Closing Arguments

During the government's closing argument, the prosecutor framed the trial as a credibility battle. The prosecutor staged the credibility of Agent Steele against that of

Nunez, and noted that Nunez was an admitted drug dealer, that he had two prior felony convictions, that he was in the United States illegally at the time of his arrest, that he had applied for and received an Indiana identification card in a false name, that he admitted in his November proffer that he bought and sold large amounts of drugs but then recanted his story at trial, and that he testified at trial that he lied when it served his interests. The prosecutor described Agent Steele as a good agent who was "just doing his job."

During Nunez's closing argument, defense counsel challenged Agent Steele's credibility, specifically in regard to the code words' meanings. Defense counsel stated that the hard evidence did not support the government witnesses' testimony, and that their opinions were perhaps warped by the nature of their work (that the agents saw "the world through drug-colored glasses").

During the government's rebuttal argument, the prosecutor told the jury that defense counsel had not provided a reason to believe Nunez over Agent Steele or to doubt Agent Steele's credibility, because no reason existed. The prosecutor told the jury that defense counsel had a difficult job, but that "he's stuck with his client in the case," and that defense counsel's closing argument was "nothing more than a not so thin, veiled, disguised attack on the integrity of a good DEA special agent." The prosecutor concluded its closing argument by asking the jury to "return a verdict based on the overwhelming amount of evidence in this case." At no point during closing arguments did Nunez object.

Nunez argues, for the first time on appeal, that the prosecutor made improper comments during his closing and rebuttal argument. Nunez's failure to raise this issue at

trial means that our review is limited to plain error, which requires Nunez to establish "not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003) (quoting *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003)). Improper statements made during closing argument are rarely reversible error. *United States v. Anderson*, 450 F.3d 294, 300 (7th Cir. 2006); *United States v. Amerson*, 185 F.3d 676, 685-86 (7th Cir. 1999).

We find that none of the challenged remarks during closing arguments were improper. "[T]he government is allowed to comment on the credibility of a witness . . . as long the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Morgan*, 113 F.3d 85, 89 (7th Cir. 1997) (quoting *United States v. Goodapple,* 958 F.2d 1402, 1409-10 (7th Cir. 1992)). The prosecutor's argument in favor of Agent Steele's version of events was perfectly acceptable, considering Agent Steele was the key witness for the government and Nunez testified in his own defense. *See Bowman*, 353 F.3d at 550-51 (discussing similar comments in closing arguments and determining that all were proper based on the witnesses and evidence presented at trial); *Sandoval*, 347 F.3d at 631 (stating that a prosecutor is entitled to ask the jury to weigh the credibility of the witnesses). Aside from the collateral evidence of the other witnesses and the drugs, money, and other materials seized during the course of the investigation, the case hinged on the testimony of these two individuals. Nothing in the prosecutor's closing argument was based on evidence outside of the trial record. The prosecutor merely reiterated the experience and qualifications of

Agent Steele, and the criminal record of Nunez, all of which was testified to (without objection) during trial. There was no improper vouching.

Nunez also challenges comments made by the prosecutor during rebuttal that, in Nunez's opinion, disparaged defense counsel and implied that defense counsel thought he was guilty. Nunez claims these comments infringed on his right to assistance of counsel. We are unconvinced. The prosecutor's comments that Nunez categorizes as "disparaging to defense counsel" (that defense counsel's argument was "nothing more than a not so thin, veiled, disguised attack on the integrity of a good DEA special agent") was far from disparaging. The prosecutor's comment was an attack on the strength (or lack thereof) of the defense—which is permissible—and was not a personal attack on defense counsel. *See United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007) (drawing attention to the weaknesses in the defense is permissible in closing argument) (citing cases); *United States v. Washington*, 417 F.3d 780, 787 (7th Cir. 2005) (prosecutor's argument that focused on the lameness of the defense was proper). Moreover, the prosecutor's comment was in direct response to defense counsel's attacks on the credibility of Agent Steele and was thus proper rebuttal argument.

The prosecutor's comment that defense counsel was "stuck with his client" did not imply that defense counsel believed his client was guilty, nor was it improper. Taken in context, the prosecutor was explaining that neither the facts nor the law were on Nunez's side, and so defense counsel was left with a weak defense of poor police work. The comment struck at the weakness of the defense, and not at any doubt by defense counsel in his client's innocence. Although this may not have been the most artful

rebuttal argument, there was nothing impermissible about it. *See Bowman*, 353 F.3d at 551 (finding the prosecutor's emphasis on the defendant's past criminal behavior and the police officer's version of the events to be supported by facts in the record and thus used for permissive purposes) (citing *Sandoval*, 437 F.3d at 631). Furthermore, the district court judge ameliorated any potential that the jury relied on improper argument by counsel when it instructed the jury prior to its deliberations that statements and arguments of counsel are not evidence unless made as an admission or stipulation of fact. *See Washington*, 417 F.3d at 787. We find no impropriety in the government's closing or rebuttal argument.

### C. Cumulative Error

Finally, we turn to Nunez's argument that the cumulative prejudice of the errors denied him a fair trial. The only errors to consider are the prosecutor's improper question requiring Nunez to say that a DEA agent was lying, and the prosecutor's improper comment that Nunez's testimony regarding the proffer session was "patently false." When an appellant alleges cumulative error, this Court will only consider plain errors and errors which were preserved for appellate review. *Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000). Nunez preserved both of these issues at the trial court, and so we consider whether these errors prejudiced Nunez. In determining prejudice, we consider the following factors: (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided (and the efficacy of) a curative instruction; (5) whether the defendant had an opportunity

to rebut the remark; and (6) the weight of the evidence against the defendant. *Corley*, 519 F.3d at 727. "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Washington*, 417 F.3d at 786 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

We first note that the errors do not implicate any of Nunez's specific trial rights; rather they are instances of general prosecutorial misconduct. *See United States v. Wesley*, 422 F.3d 509, 515 (7th Cir. 2005). Accordingly, we consider the remarks in light of the entire record to determine if the improper comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden*, 477 U.S. at 181).

We do not agree that the outcome of the trial would have differed absent these errors. It is unlikely that the prosecutor's improper question posed to Nunez regarding the credibility of the DEA agent's testimony caused any damage to Nunez's case. Nunez testified to an entirely different version of events as to what took place at the proffer session than what Agent Steele testified to, and therefore a reasonable jury would undoubtedly infer that Nunez believed the agent to be lying in his testimony. The question may have gone too far in the sense that it did not give the jury credit for being able to reach the logical conclusion on its own that Nunez believed the agent was lying, but this type of improper question rarely amounts to reversible error, and this case is no exception. *See Thomas*, 453 F.3d at 846; *McKee*, 389 F.3d at 700.

As to the prosecutor's improper comment that Nunez's testimony was "patently false," the district court judge immediately struck the remark and instructed the jury to disregard it. The remark was not so powerful or over-whelming to make it impossible for the jury to disregard it, and so we presume that the jurors followed the in-structions from the court. *See United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (noting that jurors are pre-sumed to be capable of disregarding improper evidence presented to them unless the evidence is so incriminating that they could not be expected to put it out of their minds).

Both of these errors taken together cast little doubt on the guilt of Nunez. Neither of these errors implicated the core issue of Nunez's guilt or innocence. The government presented convincing evidence of Nunez's guilt, which included over one hundred phone conversations between Nunez and the conspiracy leader, Carrillo (which Nunez conceded included his voice) in a seven-month period of time which used code words to discuss the buying and selling of drugs on a national level. The evidence also included Nunez's statements to Agent Steele at a proffer session that he had purchased two and a half pounds of methamphetamine from Carrillo, that the drugs were provided by Carrillo on credit, and that he resold the drugs to others. Methamphetamine and cutting agents were seized from Carrillo and other co-conspirators, and a digital scale commonly used by drug dealers was seized from Nunez's residence. The intercepted phone calls revealed that (1) Nunez knew of at least five trips another co-conspirator made to California to get between six and twenty pounds of methamphetamine per trip, (2) the individual brought it back to Indiana (a fact that Nunez also admitted at the proffer session), and (3) Nunez

expressed concern to Carrillo after the co-conspirator transporting a large amount of methamphetamine was caught with the drugs. Nunez admitted at trial that he was a drug dealer and that he lied in the past when it served his purposes. In light of these damning admissions and evidence, there is no reason to believe that the outcome of the trial would have been any different absent the improper statements by the government. There was no cumulative error resulting in prejudice to Nunez.

For the reasons contained herein, we find no error warranting a new trial. Accordingly, we affirm Nunez's conviction.