In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1313

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GONZALO GARCIA-AVILA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 155 — **Joan Humphrey Lefkow**, *Judge.*

ARGUED NOVEMBER 5, 2013 — DECIDED DECEMBER 13, 2013

Before BAUER, WILLIAMS, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Gonzalo Garcia-Avila ("Garcia")
was charged with two counts: conspiracy to distribute and
possess with intent to distribute methamphetamine and
attempted distribution of methamphetamine. 21 U.S.C. §§ 846
and 841(a)(1). A jury convicted Garcia of both counts, and he
now appeals. He contends that the district court erred when it
(1) allowed expert testimony to taint the jury and (2) admitted
evidence of his prior ecstasy transactions. He also argues that

the prosecution's improper statements during rebuttal arguments unfairly prejudiced the jury. We find no error for the reasons that follow.

## I. BACKGROUND

This appeal relates to Garcia's involvement in planning a drug deal that took place on March 1, 2010.

### A. The Meeting on February 24, 2010

In exchange for an immunity agreement, a confidential informant ("CI") agreed to pose as an individual looking to buy drugs. On February 24, 2010, the CI met with Pedro Quiroz ("Quiroz"), whom he had known for several years, as well as three other men—Francisco Mendez ("Mendez"), Carlos Figueroa ("Figueroa"), and Garcia. Unbeknownst to these men, the CI wore a wire and was secretly recording the conversations that took place. At the meeting, the CI expressed interest in purchasing "ice," a slang term for methamphetamine, as well as other drugs. Garcia told the CI that he would sell him one or two pounds of methamphetamine for $30,000. The CI asked if methamphetamine was "the only kind that's gonna arrive now," and Garcia responded that he could get "some of the other stuff too," referring to ecstasy. The CI asked Garcia what he charged for a "bottle," and Garcia stated, "[t]he last one they sent me … [cost] 450." At the end of the meeting, the CI shook hands with Garcia, and then departed with Mendez and Quiroz.

### B.  The Drug Bust on March 1, 2010

After the meeting, Garcia, Mendez, Quiroz, Figueroa, and Rosendo Jimmenez ("Jimmenez") were in frequent contact.[1] Quiroz called the CI and informed him that the deal was set to take place on March 1, 2010. The CI worked in concert with DEA agents to prepare for the drug bust. On March 1, 2010, the CI and an undercover DEA agent drove in separate vehicles to meet with Mendez and Quiroz; the CI again wore a wire and secretly recorded the conversations that took place. The undercover agent had $36,000 hidden in a secret compartment in his van; he handed the money to Mendez, and allowed him to inspect it. He told Mendez he would get the money once the exchange was made.

The CI then drove with Mendez and Quiroz to a grocery store near 79th and Pulaski to complete the deal. Mendez explained that Garcia wanted the CI to call the agent and tell him to remove the money and turn over his van so it could be loaded with drugs. The CI told Mendez, however, that the agent was unwilling to give up his vehicle, so the conspirators decided to load the drugs into the CI's car instead. Figueroa asked the CI if it was okay to "throw [the drugs] in the trunk for you?" and the CI assured him that it was. The CI then exited his vehicle and left the car running with his keys in the ignition. Figueroa drove away in the CI's car.

---

[1]  Phone records show that between February 24, 2010, and March 1, 2010, there were 115 contacts between Garcia and Mendez, 65 contacts between Garcia and Figueroa, 17 contacts between Garcia and Jimmenez, and 34 contacts between Mendez and Quiroz.

A short time later, DEA agents stopped a different car, which Figueroa was driving. Garcia was a passenger in the car. The agents recovered a set of keys from Garcia; it included a key to the CI's vehicle. Agents then used the key to open the CI's vehicle; they found a plastic bag containing 888.2 grams of pure methamphetamine on the front passenger seat. The drugs had a street value of $355,000.

On March 2, 2010, Garcia, Quiroz, Mendez, Figueroa, and Jimmenez were charged in a complaint, alleging that they had intentionally and knowingly conspired to distribute methamphetamine on March 1, 2010. They were later named in indictments returned by a grand jury.

### C.  The Trial

Figueroa, Jimmenez, Quiroz, and Mendez were indicted alongside Garcia, but Garcia was granted a separate trial. On June 29, 2011, the government filed a pre-trial motion to admit evidence concerning Garcia's ability to obtain ecstasy as well as methamphetamine. On July 20, 2011, the court ruled that this evidence was admissible.

At Garcia's trial, Jon Johnson ("Johnson"), a DEA agent with 24 years of experience, was qualified as an expert. The prosecution provided Johnson with transcripts of the conversations that took place on February 24, 2010, and March 1, 2010. He gave his opinions about the meaning of certain code words used during the conversations as well as statements made by Garcia. On direct examination, Johnson was asked numerous questions beginning with, "What do you understand [Garcia] to mean when he said …?" Defense counsel never objected to the form of these questions or to Johnson's responses. On

cross-examination, Johnson made clear that he (1) had not participated in any aspect of the investigation, (2) had not listened to the recordings or to trial testimony, (3) did not have personal knowledge about the speakers identified in the transcripts, and (4) could not authenticate the voices identified in the transcripts.

During closing arguments, the prosecutor stated, "[Garcia is] sitting there with Carlos Figueroa, who is using all the lingo about methamphetamine deals and Ecstasy deals … . It's not a coincidence that … this conversation is entirely in slang and in code words … . [Garcia is] using those words because he understands them. He knows them, and he does these things." Defense counsel made no objections.

On August 1, 2011, after six days of trial, the jury convicted Garcia of both counts. He was sentenced to 120 months' imprisonment and timely appealed to this Court.

## II. DISCUSSION

Garcia argues that his conviction should be vacated and that his case should be remanded for a new trial. He contends that the district court erred by admitting the expert testimony of Johnson, and by allowing evidence of his prior ecstasy dealings. He also claims that the prosecutor's statements during rebuttal arguments unfairly prejudiced the jury.

### A. Johnson's Expert Testimony

Garcia contends that the district court abused its discretion by admitting Johnson's expert testimony. Garcia does not object to Johnson's qualifications as an expert. Instead, he objects to Johnson's testimony, which he contends unfairly

prejudiced the jury. Normally, we review a district court's admission of expert testimony for abuse of discretion. *United States v. Pansier,* 576 F.3d 726, 738 (7th Cir. 2009). However, since defense counsel failed to object to Johnson's testimony at trial, this issue must be reviewed for plain error. *United States v. Canady,* 578 F.3d 665, 669 (7th Cir. 2009). "Under the plain error standard, we must determine whether there was (1) an error, (2) that was plain, meaning clear or obvious, (3) that affected the defendant's substantial rights in that he probably would not have been convicted absent the error and, (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Christian,* 673 F.3d 702, 708 (7th Cir. 2012).

Federal Rule of Evidence 704(b) states:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have the mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

This Court has held that experts may testify as to the way drug dealers operate and to the meaning of code words dealers use as long as the testimony is based on their expert opinion and not on the defendant's specific mental processes. *United States v. Are,* 590 F.3d 499, 512–13 (7th Cir. 2009); *United States v. Avila,* 557 F.3d 809, 820 (7th Cir. 2009); *United States v. Ceballos,* 302 F.3d 679, 687–88 (7th Cir. 2002). In *United States v. Lipscomb*, 14 F.3d 1236, 1243 (7th Cir. 1994), for example, we upheld the district court's admission of expert testimony because officers testified that their opinions were based on

their knowledge of "common practices in the drug trade" and not on "some special familiarity with the workings of Lipscomb's mind." We stated:

> When a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.

*Id.* at 1242.

Similarly, in *Are*, we held that the admission of expert testimony about "coded language" did not violate Rule 704(b), since the expert based his testimony on his experience and training. 590 F.3d at 513. The expert made clear that he had not interviewed any witness in relation to the trial, and had not reviewed any documents in connection with the case, other than the transcripts. *Id.* We concluded that it was "apparent that Coleman testified as an expert on the basis of his knowledge of drug dealers' use of coded language generally and not on some special knowledge of the defendant's mental processes or mental states." *Id.*

In the instant case, Johnson was asked several questions beginning with, "What do you understand [Garcia] to mean when he said …?" While the phrasing of these questions may have alluded to Garcia's mental state, Johnson made clear to the jury that he was not testifying based on personal knowledge. He testified that he (1) could not vouch for the accuracy

of the transcripts, (2) had not listened to the recordings of the conversations that took place on February 24, 2010, and March 1, 2010, and (3) lacked personal knowledge of the identities of any of the speakers. In addition, on cross-examination, Johnson admitted that he had not participated in any aspect of the investigation. Johnson made clear that he was not testifying based on "some special familiarity with the workings of [Garcia's] mind," but instead, was relying upon his 24 years of experience and his "knowledge of common criminal practices" in order to help the jury understand coded language related to drug transactions. *Lipscomb,* 14 F.3d at 1242–43.

This is not a case where Johnson was testifying both as an expert and as a lay witness, where the risk of unfair prejudice is more troublesome. *See, e.g.*, *Lipscomb,* 14 F.3d at 1242 ("Testimony is understood to carry dangers of its own, particularly when the expert is also one of the officers involved in the arrest."). Here, Johnson testified only as an expert witness; he had no prior links to Garcia, nor had he participated in investigating the case.

Furthermore, defense counsel never once objected during Johnson's testimony, either to the form of the questions, or to Johnson's responses. Thus, even if portions of Johnson's testimony were admitted in error, we can reverse only if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Christian*, 673 F.3d at 708. We find no error here; reversal on this ground is not warranted.

### B. Admission of 404(b) Evidence Related to Garcia's Prior Ecstasy Activities

Garcia also argues that the district court abused its discretion when it admitted evidence of his prior ecstasy transactions. He claims that this evidence was used for propensity purposes and unjustly prejudiced the jury against him.

When a trial court admits evidence over a defendant's objection, we review the district court's ruling for abuse of discretion. *Avila,* 557 F.3d at 819. "The district court's evidentiary rulings are afforded special deference and will be reversed 'only where no reasonable person could take the view adopted by the trial court.'" *United States v. Reese,* 666 F.3d 1007, 1015 (7th Cir. 2012) (quoting *United States v. Vargas,* 552 F.3d 550, 554 (7th Cir. 2008)). "Even when an abuse of discretion occurs, however, reversal only follows if admission of the evidence affected the defendant's substantial rights." *United States v. Richards*, 719 F.3d 746, 758 (7th Cir. 2013). This Court asks "whether an average juror would find the prosecution's case significantly less persuasive without the improper evidence." *United States v. Miller,* 673 F.3d 688, 700 (7th Cir. 2012).

Rule 404(b) bars the admission of evidence of "a crime, wrong, or other act" committed by the defendant when it is used to "show a defendant's propensity to commit a crime, [or] to show that he or she acted in conformity with that propensity on the occasion in question." *United States v. Jones,* 389 F.3d 753, 756 (7th Cir. 2004). This evidence, however, may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). To determine if 404(b) evidence is admissible, this Court employs a four-part test. Evidence is admissible if (1) the evidence is directed towards establishing a matter other than the defendant's propensity to commit crimes charged, (2) the other act is similar and close enough in time to be relevant, (3) the evidence is sufficient to support a jury finding that the defendant committed the other act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Reese,* 666 F.3d 1007, 1015 (7th Cir. 2012) (quoting *United States v. Baker,* 665 F.3d 677, 681 (7th Cir. 2011)).

During their conversation on February 24, 2010, the CI asked Garcia how much he charged for a "bottle," meaning ecstasy. Garcia responded, "Let me call him. The last one they sent me … 450," which the CI took to mean that a bag of ecstasy tablets cost $450. Garcia also added, "some; if you want, next time he comes, right? He'll bring you some." The court allowed evidence of Garcia's ecstasy-related comments over defense counsel's objections, explaining that "the mention of other substances that are available or that may become available does have probative impact in this case." The court allowed the evidence "with the clear understanding that it should not reference or in any way indicate the prior transactions."

While Garcia asserts that the evidence should be evaluated under Rule 404(b), the government argues, as it did in the district court, that the ecstasy evidence is direct evidence of the charged methamphetamine crimes and therefore is not "other acts" evidence in the first place. We need not definitively

resolve this evidentiary dispute; even if the ecstasy evidence falls within the scope of Rule 404(b), any possible error related to its admission was harmless, and did not affect Garcia's substantial rights. The evidence implicating Garcia in the methamphetamine transaction was more than sufficient to support his conviction. In the days leading up to the drug bust, Garcia exchanged numerous phone calls with other members of the drug conspiracy. He was in frequent contact with his co-conspirators on the day the drug deal took place. When Garcia was arrested after the drug transaction was complete, he possessed the keys to the CI's car, where the methamphetamine had been placed. Taken together, these facts establish that Garcia was integral in organizing and implementing the methamphetamine deal that took place on March 1, 2010. Thus, any error related to the admission of the ecstasy evidence was harmless.

## C. The Prosecutor's Statement in Rebuttal Arguments

Finally, Garcia argues that the government made an improper propensity inference during its rebuttal argument that unfairly prejudiced the jury against him. When reviewing a claim of prosecutorial misconduct, we first consider whether the remark was improper; then we consider whether it prejudiced the defendant. *United States v. Serfling,* 504 F.3d 362, 377 (7th Cir. 2007). "Improper statements made during closing argument are rarely reversible error." *United States v. Bowman,* 353 F.3d 546, 550 (7th Cir. 2003) (citing *United States v. Anderson*, 450 F.3d 294, 300 (7th Cir. 2006)). "Ultimately, the inquiry turns on whether the improper statement 'so infected the trial with unfairness as to make the resulting conviction a denial of

due process.'" *Id*. (quoting *Darden v. Wainwright,* 477 U.S. 168, 181 (1986)).

Garcia never objected to the prosecutor's "and he does those things" comment at trial, but now argues on appeal that this statement was improper. "When a defendant objects for the first time on appeal that a prosecutor made improper comments during closing arguments, we review only for plain error." *United States v. Turner*, 651 F.3d 743, 751 (7th Cir. 2011); *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003). Since Garcia failed to object to this comment at trial, he must show "not only that the remark[] denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remark[]." *Id.* (quoting *United States v. Sandoval,* 347 F.3d 627, 631 (7th Cir. 2003)).

Here, Garcia asserts that when the prosecutor said, "and he does those things" during rebuttal arguments, he was suggesting that Garcia had a history of dealing drugs, which unfairly prejudiced the jury against him. This statement standing alone, however, was insufficient to "so infect the trial with unfairness" as to deny Garcia a fair trial. In *Turner,* we held that a prosecutor's "once a drug dealer, always a drug dealer" argument did not constitute plain error. 651 F.3d at 752. We explained that "so long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused." *Id.* (quoting *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000)). Here, the prosecutor's statement was based upon the transcripts presented at trial. The outcome of Garcia's trial did not turn on this lone remark by the prosecutor, and we find no plain error.

### III.  CONCLUSION

We find that the court did not err when it (1) admitted the expert testimony of Johnson and (2) allowed evidence of Garcia's comments related to his prior ecstasy dealings. We also find no error related to the prosecutor's statements during rebuttal arguments. For these reasons, we uphold Garcia's convictions and AFFIRM the decision of the district court.